U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 MAY 30  AM 10: 31

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

CLERK

BY_____LAW_____
DEPUTY CLERK

IN THE MATTER OF THE SEARCH OF:
a Residence and Three Accessory Structures
Comprising 4657 Calvin Coolidge Memorial
Highway, Guilford, Vermont 05301
(also referred to as "4657 Coolidge Highway").

Case No. __2: 19-mj-101-1__

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Anders Ostrum, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant for evidence and instrumentalities of a criminal

offense against the United States, specifically violations of Title 26, United States Code, Section

7201 (Attempt to Evade or Defeat Tax), for the following premises:  the residence and three

accessory structures of CHRISTOPHER M. PARKER, located at 4657 Calvin Coolidge

Memorial Highway, Guilford, Vermont 05301 (hereinafter "PREMISES" or "4657 Coolidge

Highway"), further described in Attachment A, for the things described in Attachment B.

2.     I am a Special Agent with the United States Department of Treasury, Internal

Revenue Service, Criminal Investigation ("IRS-CI"), and have been since July 24, 2017.  From

August 1, 2017 through February 8, 2018, I attended a three-part basic training program at the

Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia.  The three-part

training program consisted of a one-day IRS-specific pre-basic training course, a three-month

FLETC Criminal Investigator Training Program, and a three-month IRS-CI Special Agent Investigative Techniques Program.  In these programs, I studied a variety of law enforcement, criminal investigative, and tax crime issues, including search and seizure, the Internal Revenue laws, and Internal Revenue Service policies and procedures in criminal investigations.  Before my employment with IRS-CI, I held positions in both private industry and public accounting. From approximately 2015 through 2017, I worked in private industry as the assistant controller overseeing accounting operations for two international employers.  From approximately 2011 through 2014, I worked in public accounting where I specialized in audit, tax, and accounting services.  While working in public accounting I became a Certified Public Accountant ("CPA") licensed in the State of Vermont, a Certified Fraud Examiner ("CFE") certified by the Association of Certified Fraud Examiners ("ACFE"), and a Chartered Global Management Accountant ("CGMA") designated by the American Institute of Certified Public Accountants ("AICPA").  I graduated cum laude from Elmira College in New York in June of 2011 with a bachelor's of science degree in accounting.

3.      Since my field deployment date with IRS-CI in February 2018, I have participated in numerous search warrants relating to financial investigations.

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2

## SYNOPSIS OF INVESTIGATION

5.      IRS-CI is assisting the United States Attorney's Office (USAO) for the District of

Vermont in an investigation of CHRISTOPHER M. PARKER ("PARKER").  Records I have

reviewed in the course of this investigation, including the bank, state, and tax records referenced

below, indicate that PARKER is the owner of CHRISTOPHER M. PARKER, LLC, which does

business as "CHRIS PARKER BUILDING AND RESTORATION" and "CHRIS PARKER."

Evidence developed in this investigation shows PARKER filed false tax returns with the Internal

Revenue Service ("IRS") for tax years 2014, 2015, 2016, and 2017.  Specifically, evidence

shows PARKER is evading federal income taxes in violation of 26 U.S.C. § 7201 by

intentionally underreporting gross receipts from his business on his personal income tax returns

(Forms 1040).  Evidence also shows that PARKER conducted financial transactions, including

transactions involving his son, Kyle Holmquist-Parker ("Holmquist-Parker"), to engage in tax

evasion by, among other things, diverting checks payable to PARKER's business to Holmquist-

Parker's account.  Based on evidence gathered throughout this investigation, this affidavit will

establish probable cause that PARKER violated 26 U.S.C. § 7201, Attempt to Evade or Defeat

Tax, and that evidence of such criminal violations can be found at the PREMISES.

## ELEMENTS OF THE CRIME

6.      Demonstrating a violation of 26 U.S.C. § 7201 requires proof of the following

elements: (1) an affirmative act constituting an attempt to evade or defeat a tax or the payment

thereof; (2) an additional tax due and owing; (3) willfulness.

## PROBABLE CAUSE

CHRISTOPHER M. PARKER: Business and IRS History

7.      I reviewed online records from the State of Vermont Secretary of State's office and determined that CHRISTOPHER M. PARKER is the owner and sole member of CHRISTOPHER M. PARKER, LLC, a Vermont domestic limited liability company registered with the state on September 22, 2006.  The entity filings provide a business description which reads "Build Repair Structures."  The designated office and business address listed with the state is 4657 Coolidge Highway, Guilford, Vermont 05301.

8.      I reviewed PARKER's business webpage at www.oldbuildingfix.com, titled "Chris Parker Building & Restoration, Making Old Buildings Feel Good Again."  The webpage describes services the business offers, including additions, restoration, and structural work.  The address listed on the business webpage is 4657 Coolidge Highway, Guilford, Vermont 05301.

9.      I reviewed a People's United Bank (PUB) signature card for PARKER's business checking account ending in 8758, which listed the "Business Name" of the accountholder as "CHRISTOPHER M. PARKER, LLC" and a business address of 4657 Coolidge Highway, Guilford, Vermont 05301.

10.      On October 12, 2018, I drove past 4657 Coolidge Highway, Guilford, Vermont 05301.  On this date I observed two separate signs at the front of the driveway which read "CHRIS PARKER, House & Barn Restoration, Guilford, VT, 802-257-4610, oldbuildingfix.com."  I observed the same sign on January 11, 2019.  I also observed four structures which are further described in Attachment A as structures #1, #2, #3, and #4.

4

11.     During the period from November 5, 2018 through December 4, 2018, mail was delivered to 4657 Coolidge Highway, Guilford, Vermont 05301, addressed to CHRIS PARKER, CHRISTOPHER M. PARKER, and CHRISTOPHER M. PARKER, LLC.  During this time, one piece of mail delivered to the PREMISES was addressed to Kyle Holmquist-Parker, PARKER's son as noted above.

12.     On November 7, 2018, I interviewed PARKER together with another IRS-CI special agent at 4657 Coolidge Highway, Guilford, Vermont 05301.  PARKER's ex-wife, Macy Holmquist ("Holmquist"), was present during the interview.  The interview was conducted at PARKER's kitchen table within his residence, the first building (structure #1) on the left of the PREMISES' driveway as one approaches from the road.  Neither I nor the other IRC-CI agent entered the other three structures, but we observed tools and building materials visible in two of the structures (structures #3 and #4).   During the interview, I asked PARKER what he used the other three structures for (structures #2, #3, #4).  PARKER responded by telling me that he was the owner of a carpentry business and all of the structures were workshops for his business, CHRISTOPHER PARKER, LLC.  During the interview I observed what appeared to be business records on the kitchen table.  At one point, PARKER picked up an envelope from the table and told me that one of his business associates needed to pick up the envelope that had been sitting there for weeks.  Holmquist told me that she lives with PARKER at 4657 Coolidge Highway and prepares the books for PARKER's business before providing them to PARKER's accountant.  As Holmquist made this statement she simultaneously pointed to a laptop computer which was sitting on the kitchen table.  PARKER told me that his son, Kyle Holmquist-Parker, also lives with him at 4657 Coolidge Highway.

5

13.     After speaking with PARKER on November 7, 2018, I reviewed internal IRS tax records which indicated PARKER's business was a sole-proprietorship (self-employed), a type of business that reports its business activity on Schedule C, Profit or Loss from Business, which is a supporting schedule of the Form 1040, U.S. Individual Income Tax Return. The business address on PARKER's Schedule C was 4657 Coolidge Highway, Guilford, Vermont 05301, the same address listed as PARKER's "Home Address" on page one of the Form 1040.

14.     I reviewed PARKER's Federal income tax returns for tax years 2014, 2015, 2016, and 2017. They were all electronically signed and filed by their due dates. Each return was prepared by a paid preparer and listed PARKER's occupation as "Construction." Each return provided a daytime phone number ending in 5163, which is the same as the phone number listed on PARKER's business website.

15.     On March 29, 2019, I drove past 4657 Coolidge Highway, Guilford, Vermont 05301. At approximately 6:37 a.m., I observed two men who appeared to be working in one of PARKER's workshops (structure #3). Two trucks were parked in front of the workshop and a third sport utility vehicle (SUV) was parked in front of structure #2. Per Vermont Department of Motor Vehicle records, one of the trucks is registered to PARKER and the SUV is registered to PARKER's son, Kyle Holmquist-Parker. Based on information learned through surveillance activity, the second truck is believed to be used by one of PARKER's contractors. At approximately 7:07 a.m., all three vehicles had left the property. PUB bank records for PARKER's business checking account ending in 8758 show customer checks payable to Kyle Holmquist-Parker and several independent contractors on a frequent basis. I confirmed PARKER employed independent contractors by examining records filed by PARKER with the

IRS, specifically non-employee compensation reported by PARKER on Forms 1099-MISC (miscellaneous).

16.    I have also obtained the following information regarding the PREMISES:

    a.    I reviewed an appraisal prepared by Todd Brown of W. Todd Brown Appraisal Services for the property located at 4567 Coolidge Highway comprising the PREMISES.  The appraisal was dated April 16, 2015 and was completed for People's United Bank.  The appraisal described three structures on the PREMISES.  As noted below, it did not reference structure #3:

| Structure Name per Appraisal | Structure Description per Appraisal | Description per Attachment A |
|---|---|---|
| "Exterior Main House" | "Expanded farmhouse design constructed in 1995" | Structure #1 (Main Residence) |
| "Exterior Guest House/3 Car Garage" | "Includes a three bay garage with overhead doors… Attached is the 1,080sf guest house with kitchen, dining/living area, full bathroom, loft and 150sf enclosed three season porch…Its use is personal only and not considered a legal rental unit. It was vacant at the time of inspection but has been occupied periodically by family members." | Structure #2 |
| N/A (did not mention) | N/A (did not mention) | Structure #3 |
| "Exterior Workshop" | "1,184sf of heated workshop space on the first floor level and approximately 992sf of partially finished space (music room) on the second floor level…The building is heated (first floor), has electric, but lacks plumbing." | Structure #4 |

b. During my interview of PARKER in his main residence (structure #1) on November 7, 2018, he told me that his ex-wife and son live with him. I asked

8

PARKER the purpose of the other three structures, and he replied they were all

workshops for his business, CHRISTOPHER PARKER, LLC.

CHRISTOPHER M. PARKER: Unreported Income

17.     I reviewed PARKER's Forms 1040 for tax years 2014, 2015, 2016, and 2017

which lists business income from a Schedule C business (sole proprietorship) as PARKER's sole

source of income.

18.     PARKER's Schedule C, Profit or Loss from Business, reported the following

gross receipts or sales, gross expenses, and net profit (loss) in tax years 2014, 2015, 2016, and

2017:

| Description | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|
| Gross Receipts or Sales per Tax Returns | $668,597.00 | $628,598.00 | $471,690.00 | $347,757.00 | $2,116,642.00 |
| Gross Expenses per Tax Returns | $632,212.00 | $596,772.00 | $444,977.00 | $325,239.00 | $1,999,200.00 |
| **Net Profit (Loss) per Tax Returns** | **$36,385.00** | **$31,826.00** | **$26,713.00** | **$22,518.00** | **$117,442.00** |

19.     I further analyzed PARKER's PUB bank records as follows:

    a.  I reviewed PARKER's PUB bank records for the business checking account

        ending in 8758 in the name of CHRISTOPHER PARKER, LLC. and calculated

the following approximate gross receipts or sales amounts in tax years 2014,

2015, 2016, and 2017, based on my review of deposited items:

| Description | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|
| Gross Receipts or Sales per PUB Bank Records | $790,003.00 | $889,355.00 | $571,313.00 | $554,421.00 | $2,805,092.00 |

  b.  Many of the checks payable to PARKER contain descriptions in the "memo" or

  "for" section of the check such as "windows," "Sept. 10 Invoice," "Home

  Repairs," "Construction," "Barn/Garage Repair," "garage reno," "Home

  Renovation," "Barn," "Silo Foundation Repair," "1/3 Deposit on Barn Residing,"

  "Cabin Repair," for example.

20.  Based on the information outlined above, PARKER understated his income by the

following approximate amounts:

| Description | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|
| Gross Receipts or Sales per PUB Bank Records | $790,003.00 | $889,355.00 | $571,313.00 | $554,421.00 | $2,805,092.00 |
| Gross Receipts or Sales per Tax Returns | $668,597.00 | $628,598.00 | $471,690.00 | $347,757.00 | $2,116,642.00 |
| **Unreported Gross Receipts** | **$121,406.00** | **$260,757.00** | **$99,623.00** | **$206,664.00** | **$688,450.00** |

CHRISTOPHER M. PARKER: Affirmatives Acts and Willfulness in Evading Tax Obligations

21.     I reviewed PARKER's PUB bank activity and noted approximately 17 Currency

Transaction Reports ("CTRs") filed on PARKER since 2001. A CTR is a report that U.S.

financial institutions are required to file with FinCEN, a bureau of the U.S. Department of the

Treasury, for each deposit, withdrawal, exchange of currency, or other payment or transfer, by,

through, or to the financial institution which involves a transaction in currency of more than

$10,000. CTRs are also required to be filed with the IRS. Based on my training and experience

I know CTRs require customer-provided information, so customers are frequently aware when

CTRs are prepared by financial institutions.

22.     I reviewed PARKER's PUB bank records for the business checking account

ending in 8758 in the name of CHRISTOPHER PARKER, LLC from 2014, 2015, 2016, and

2017 which reveal PARKER cashed approximately 101 customer checks payable to PARKER in

their entirety, which total approximately $368,396.00. Because PARKER cashed these checks in

their entirety, they are not reflected on his business bank statements. Each of these 101 cashed

checks was payable to PARKER in an amount less than $10,000.00.

23.     I reviewed PARKER's PUB bank records for the business checking account

ending in 8758 in the name of CHRISTOPHER PARKER, LLC from 2014, 2015, 2016, and

2017 which reveal PARKER partially-deposited approximately 107 customer checks payable to

PARKER. Of these 107 partially-deposited checks totaling $1,380,185.00, PARKER deposited

$1,044,387.00 and received the remaining $335,798.00 in cash. 42 out of the 107 checks were

payable to PARKER in an amount over $10,000.00. Of the 42 partially-deposited checks over

11

$10,000.00, PARKER received cash in an amount less than $10,000.00 in all 42 occurrences.

Only the deposit portion of each check is reflected on PARKER's bank statements.

24.    The following summarizes the cash activity described above for years 2014, 2015,

2016, and 2017:

| Description | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|
| Cash Received from Customer Checks Cashed in their Entirety | $65,105.00 | $146,082.00 | $50,552.00 | $106,657.00 | $368,396.00 |
| Cash Received from Partially Deposited Customer Checks | $62,123.00 | $86,524.00 | $66,186.00 | $120,965.00 | $335,798.00 |
| **Total Cash Received** | **$127,228.00** | **$232,606.00** | **$116,738.00** | **$227,622.00** | **$704,194.00** |

25.    I reviewed PUB bank records for Kyle Holmquist-Parker's student plus checking

account ending in 0589 and noted the following check deposit on December 13, 2016:  Check

#2694 from Henry E. Turner and Catherine E. Turner payable to "CHRIS PARKER" for

$4,525.00.  The check was dated December 10, 2016 and had a memo which read "Work On

Dover Rd."  The back of the check had a signature which read "Chris Parker."  This is not

inclusive of all the checks payable to "CHRIS PARKER" deposited into Kyle Holmquist-

Parker's student plus checking account ending in 0589.

26.     I reviewed some of PARKER's PUB bank records for the business checking account ending in 8758 in the name of CHRISTOPHER PARKER, LLC for a portion of 2018, specifically check deposits and cashed checks.  Of the activity I reviewed, PARKER negotiated a total of $172,215.00 in customer checks.  Of the $172,215.00 in checks payable to PARKER, PARKER received cash of $100,840.00.  Some of the descriptions in the memo portion of the checks read "1203 Townshend #2," "Payment #2," "#3 for barn," "barn repair," "Barn staining," etc.  This pattern of cashing customer checks is consistent with tax years 2014 through 2017; years which PARKER substantially underreported his taxable income.

27.     Based on my training, experience and participation in Title 26 and Title 26-related investigations, I know that cashing customer checks, operating extensively in cash, structuring banking transactions to avoid currency transaction report filings, and endorsing customer checks to third-parties are all affirmative steps that individuals who do not comply with their federal tax obligations utilize in order to conceal their income and assets from government authorities.

CHRISTOPHER M. PARKER: Premises to be Searched

28.     I have probable cause to believe that the PREMISES to be searched contain fruits, evidence, and instrumentalities of the violations of the federal statutes listed above, as described in Attachment B.

29.     The Internal Revenue Code, section 6001, requires a business to retain records. Based upon my training and experience I know that individuals who are self-employed generally maintain records that support an item of income or deduction on a tax return at their personal residence and/or an accessory structure(s) used in conjunction with their business.

30.     Based on my training, experience and participation in Title 26 and Title 26-related investigations, I know that personal records which are used to prepare the Form 1040, U.S. Individual Income Tax Return, are commonly maintained within a residence. Examples of personal records used in the preparation of the Form 1040 include property tax bills, health related bills, personal bank statements, Forms 1099-INT (annual tax statement provided by payers of interest income), purchase receipts supporting state sales tax paid, and receipts for charitable contributions.

CHRISTOPHER M. PARKER: Seizure of Computer Equipment and Data

31.     On November 7, 2018, I interviewed PARKER at his residence at 4657 Coolidge Highway, Guilford, Vermont 05301.  As set forth above, PARKER's ex-wife, Macy Holmquist, was also present during the interview.  Holmquist told me that she lives with PARKER at 4657 Coolidge Highway, Guilford, Vermont 05301.  During the interview, Holmquist told me that she helps prepare the books for PARKER's business before providing them to PARKER's accountant.  Holmquist pointed to a computer which was on the kitchen table as she made this statement.

32.     Based upon my training and experience, and information provided to me by other agents, I know that businesses frequently use computers to carry out, communicate, and store records about their operations. These tasks are frequently accomplished through sending and receiving business related e-mail and instant messages; drafting other business documents such as spreadsheets and presentations; scheduling business activities; arranging for business travel; storing pictures related to business activities; purchasing and selling inventory and supplies

14

online; researching online; and accessing banking, financial, investment, utility, and other accounts concerning the movement and payment of money online.

33.     From my training and experience, and information provided to me by other agents, I am aware that businesses commonly store records of the type described in Attachment B in computer hardware, computer software, computer-related documentation, and storage media.

## TECHNICAL TERMS

34.     Based on my training and experience, I use the following technical terms to convey the following meanings:

     a.  IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

     b.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same
state.

c. Storage medium: A storage medium is any physical object upon which computer
data can be recorded. Examples include hard disks, RAM, floppy disks, flash
memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

35. As described above and in Attachment B, this application seeks permission to
search for records that might be found on the PREMISES, in whatever form they are found. One
form in which the records might be found is data stored on a computer's hard drive or other
storage media. Thus, the warrant applied for would authorize the seizure of electronic storage
media or, potentially, the copying of electronically stored information, all under Rule
41(e)(2)(B).

36. *Probable cause.* I submit that if a computer or storage medium is found on the
PREMISES, there is probable cause to believe those records will be stored on that computer or
storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or
remnants of such files can be recovered months or even years after they have been
downloaded onto a storage medium, deleted, or viewed via the Internet.
Electronic files downloaded to a storage medium can be stored for years at little
or no cost. Even when files have been deleted, they can be recovered months or

16

years later using forensic tools.  This is so because when a person "deletes" a file

on a computer, the data contained in the file does not actually disappear; rather,

that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or

slack space—that is, in space on the storage medium that is not currently being

used by an active file—for long periods of time before they are overwritten.  In

addition, a computer's operating system may also keep a record of deleted data in

a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media—in particular,

computers' internal hard drives—contain electronic evidence of how a computer

has been used, what it has been used for, and who has used it.  To give a few

examples, this forensic evidence can take the form of operating system

configurations, artifacts from operating system or application operation, file

system data structures, and virtual memory "swap" or paging files.  Computer

users typically do not erase or delete this evidence, because special software is

typically required for that task.  However, it is technically possible to delete this

information.

d.   Similarly, files that have been viewed via the Internet are sometimes

automatically downloaded into a temporary Internet directory or "cache."

37.   *Forensic evidence.*  As further described in Attachment B, this application seeks

permission to locate not only computer files that might serve as direct evidence of the crimes

described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the

18

innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data

typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.

Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

38. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic

electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

39.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted

22

scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

40.     Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

41.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

## **REQUEST FOR SEALING**

42.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the information contained within these documents contain tax return information and other sensitive information (other than taxpayer return information) which should not be released to the public.

Respectfully submitted,

Anders Ostrum
Special Agent
IRS Criminal Investigation

Subscribed and sworn to before me
on May 30, 2019:

JOHN M. CONROY
UNITED STATES MAGISTRATE JUDGE

24